UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 APR 13  PM 3: 57

CLERK

BY _____
DEPUTY CLERK

PHILIP HEALY and LEE-ANN HEALY,      )
                                     )
        Plaintiffs,                  )
                                     )
    v.                               )        Case No.  5:15cv82
                                     )
ADAMS CONSTRUCTION VT, LLC a/k/a     )
ADAMS CONSTRUCTION, WILLIAM W.       )
ADAMS a/k/a "BILLY" ADAMS, and       )
LESLEY ADAMS,                        )
                                     )
        Defendants.                  )

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Philip Healy and Lee-Ann Healy (collectively, the "Healys" or "Plaintiffs"), by and through the undersigned counsel, allege as follows:

### NATURE OF THE ACTION

1.      This is an action against Defendants Adams Construction VT, LLC a/k/a Adams Construction ("Adams Construction") and its principal member, owners, William W. Adams a/k/a "Billy" Adams ("Mr. Adams") and his wife, Lesley Adams ("Mrs. Adams") (collectively, the "Defendants") for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, consumer fraud under the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, quantum meruit/unjust enrichment, conversion and for an accounting based upon the Defendants' outrageous and unlawful activities as the individuals and general contractors hired by the Plaintiffs to renovate and build a home at 112 Thomas Pasture Road in Stowe, Vermont.

1

2.      In 2012, the Healys hired the Defendants to perform a multi-million dollar renovation of their home at 112 Thomas Pasture Road (the "renovation project"). The work to be performed by the Defendants included remodeling certain portions of the existing home, knocking down other sections of the home and then building from the ground-up new sections of the home. The initial cost and budget for the renovation project was estimated and represented by the Defendants to be $1,500,000 to $2,000,000 to complete the renovation. As the renovation project progressed, both the Defendants and the Healys agreed that there would be an increase to that budget but Mr. Adams assured and promised the Healys that he could provide the renovations with top of the line finishes and installations for between $300 and $400 per square foot "all-in," depending on the area to be finished. By the end of the renovation project, the Plaintiffs had paid the Defendants more than $4,350,000 for the renovation project which well exceeded the quoted price.

3.      The Defendants were hired to manage the entire renovation project as the general contractors and to oversee, manage, supervise and pay all of the subcontractors hired by the Defendants to work on the Healys' home. Mr. Adams, in addition to being a co-owner of Adams Construction, managed the day-to-day construction of the renovation project, hired and paid the subcontractors and also handled the finances of the project. Mrs. Adams, who was also an owner of Adams Construction, took part in many of the meetings between the Healys and Mr. Adams and was also generally responsible for handling the funds provided to the Defendants by the Healys. Both before the Healys agreed to hire the Defendants, and during the course of the renovation project, Mr. and Mrs. Adams had agreed to account for all the funds provided to them by the Healys.

2

4.     Before the Defendants began work on the renovation project, Mr. Adams agreed in several conversations with Philip Healy and/or with Lee-Ann Healy to charge the Healys on a cost-plus basis for the Defendants' general contracting services.  The cost-plus basis builder's fee (the "builder's fee") agreed upon by the Healys and the Defendants required the Healys to pay the Defendants a fee of 10% of all sums paid to the subcontractors that had been hired and paid by the Defendants in connection with the Healys' renovation project.  The Defendants agreed to charge this fee as part of their promised regular billings and accountings to the Healys.

5.     The cost-plus basis builder's fee agreed upon by the parties did, however, have several agreed upon exclusions.  All supplies purchased by the Defendants were to be charged only at the Defendants' cost and Adams Construction would not receive any builder's fee as a result of those payments and/or charges.  Further, the Defendants would also not be paid a fee for any subcontractor hired by the Healys directly or for any building supplies or products purchased by the Healys directly.

6.     As part of their agreement, Mr. Adams and Mrs. Adams also expressly agreed to account for all the monies paid to the Defendants by the Healys and to account for all monies paid to the subcontractors by Mr. Adams, Mrs. Adams and/or Adams Construction.  The Healys required that Mr. Adams, Mrs. Adams and Adams Construction account for their funds so that the Defendants' cost-plus builder's fee could be properly calculated and so the Healys could properly monitor where their money was going and what it was being used for by the Defendants.

7.     The Healys relied on these various representations and promises by the Defendants before hiring Mr. Adams, his wife and their company, Adams Construction, and further relied on those representations throughout the renovation project when the Healys

3

provided funds to the Defendants so that Mr. Adams, Mrs. Adams and/or Adams Construction could pay the subcontractors as the parties had agreed. At the time the Defendants were hired, they agreed to perform the renovation project in less than a year and to have the Healys' home move-in ready by Christmas of 2013. When asked by the Healys if a written contract should be executed, Mr. Adams advised that a written contract would not be necessary because builders did not need to be licensed in Vermont, but that he agreed to all the Healys' terms of employment.

8.      Between December 2012 and October 2014, the Healys provided the Defendants with $4,350,537 as a result of the Defendants' repeated requests for funds to pay the Defendants and the subcontractors they allegedly hired to work on the renovation project. Despite the Healys' repeated and numerous oral and written requests to both Mr. Adams and Mrs. Adams throughout the renovation project for the Defendants to account for the funds provided to the Defendants, and both Mr. Adams' and Mrs. Adams' repeated promises to the Healys to account for those funds by providing invoices and detailed billing information provided to them by their suppliers and the subcontractors they hired, both Mr. Adams and Mrs. Adams repeatedly failed to account for those funds and/or ignored the Plaintiffs' numerous requests in direct breach of the contract reached by the Healys and the Defendants. Similarly, the Defendants never provided the Healys with a single invoice or other document explaining what builder's fee they were paying themselves from the millions of dollars provided to them by the Healys.

9.      In addition, at the time of the filing of this Complaint, the Healys had also paid the Defendants at least $110,000 for several weeks of labor that was never performed by the Defendants or their workmen, which despite several written requests as well, Mr. Adams and Mrs. Adams have refused to return. To date, the Defendants have also refused to account for any of the $4,350,537 provided to them by the Healys. Finally, the Healys had to spend more than

4

$80,000 on their own contractors to finish the work the Defendants never completed, including, but not limited to, HVAC work, plumbing, finishing staircases, and some of the finish carpentry. The Healys instituted this lawsuit to get back what the Defendants unlawfully and unscrupulously took from them, including any builder's fee collected by the Defendants, and to have the Defendants account for all the funds provided to them by the Healys as part of the contracted-for renovation project.

## THE PARTIES

10.    Plaintiff Philip Healy is a permanent resident of New Hampshire and resides at 4 Newbury Road, Windham, New Hampshire 03087.

11.    Plaintiff Lee-Ann Healy is a permanent resident of New Hampshire and resides at 4 Newbury Road, Windham, New Hampshire 03087.

12.    Defendant William W. Adams a/k/a "Billy" Adams is a resident of Stowe, Vermont and resides at 58 Cemetery Road, Stowe, Vermont 05672 and is a member owner of Adams Construction VT, LLC.

13.    Defendant Lesley Adams is a resident of Stowe, Vermont and resides at 58 Cemetery Road, Stowe, Vermont 05672 and is a member owner of Adams Construction VT, LLC.

14.    Defendant Adams Construction VT, LLC is a Vermont limited liability company with a principal place of business at 58 Cemetery Road, Stowe, Vermont, 05672. According to the Vermont Secretary of State's records, Adams Construction VT, LLC's sole members are the Defendants, Mr. Adams, and his wife, Mrs. Adams.

5

## JURISDICTION AND VENUE

15.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the Plaintiffs, Mr. and Mrs. Healy, who are permanent residents of New Hampshire, and the Defendants Mr. Adams, Mrs. Adams, both residents of Stowe, Vermont and Adams Construction VT, LLC, a Vermont Limited Liability Company. This Court also has jurisdiction over this action because the unlawful conduct alleged herein occurred in, and emanated from, the State of Vermont.  The amount in controversy in this case exceeds $75,000.

## FACTUAL BACKGROUND

### THE HEALYS AND THE DEFENDANTS MEET IN 2011

16.     In or about the early winter of 2011, the Healys met the Defendant Mr. Adams through the "Club Buster" ski program in Stowe, Vermont.  At the time, Mr. Adams was a ski instructor at Stowe Mountain and the Healys regularly skied with him as part of the Club Buster ski program.  While skiing with Mr. Adams, and very early in their relationship, Mr. Adams informed the Healys that he was a local contractor and was presently finishing one of his projects in Sterling Valley, Vermont.

17.     Not long after meeting Mr. Adams, the Healys, who were residing in Massachusetts at the time, began searching for a home in Stowe in hopes of finding a second home.  Around this same time, and while skiing with Mr. Adams, Mr. Adams advised the Healys that he could help them either build a home, or renovate any home that they ultimately purchased.  During many of these same conversations, Mr. Adams would also regularly tell the Healys about his personal history and would describe at length his purported long and established family ties to Stowe.

6

18.     By way of example, Mr. Adams often spoke about the close personal relationship he and his wife had with the Von Trapp family and with other Stowe families both known and unknown to the Healys.  Mr. Adams also often discussed the fact that he was a town selectman in Stowe and, on at least one occasion, described how he could use that power to resolve any issues that might arise.  At one point during the renovation project, Mr. Adams advised he would have no problem resolving any issues with the town when Mr. Adams inappropriately, and without the proper approvals, removed a number of trees on the Healys' property.  Mr. Adams also bragged to the Healys about belonging to the Stowe, Vermont Trout Club and his position on the Board of that Club.

19.     In addition to regularly pitching himself and his construction business to the Healys during their numerous conversations on the subject, Mr. Adams also took the Healys on a drive-by of a property in Sterling Valley, Vermont that Mr. Adams said he was renovating so that the Healys could see Mr. Adams' work, at least from a distance.  From the drive-by of the property, the work in progress at the Sterling Valley home appeared to be of good quality to the Healys and the Healys were growing more convinced that Mr. Adams would be a good choice as their general contractor.  In addition, Mr. Adams also took the Healys to the Trout Club to show them the Club and the work he had performed in connection with a substantial renovation of the clubhouse.  Here, Mr. Adams also boasted how he had allegedly completed the Trout Club renovation in a very short period of time clearly knowing that timing was important to the Healys.

20.     In addition to regularly pitching his services, Mr. Adams also regularly promised the Healys he could build and renovate whatever home they ultimately purchased on-time and within budget.  In picking their general contractor, the Healys were most concerned with these

7

timing and budget issues as the Healys wanted to be moved into their new home by Christmas 2013 and had planned on spending $1,500,000.00 to $2,000,000.00 on their renovation project.

21.     In the early part of 2012, the Healys went and looked at many properties as part of their home search. During this same time, the Healys and the Adamses became close personal friends. Mr. Healy and Mr. Adams spoke on a regular basis and the two families regularly shared lunches, dinners and other events. In or about the summer of 2012, the Healys found and later purchased the property at issue in this lawsuit – a single family home located at 112 Thomas Pasture Road. The Healys purchased the home primarily for its location and views and planned to do an extensive renovation.

22.     Prior to purchasing the home, the Healys asked Mr. and Mrs. Adams to look at the home and give them their advice regarding whether or not the existing home at 112 Thomas Pasture Road could be renovated in the manner the Healys wanted and if Mr. Adams and his company were up to the job. In fact, the Healys paid Mr. Adams and Adams Construction a consulting fee for property development consulting services, including, but not limited to, the management of site acquisition, funding, master planning, project viability, design, planning applications, construction delivery and asset management.

23.     At the time, and before the Healys made an offer to purchase the home, Mr. Adams assured the Healys that he and his company were more than capable of handling the renovation project and that they would have no problem completing the work within a year and within the Healys' budget. Mr. Adams also repeatedly advised the Healys that to build at a high quality level in Stowe, Vermont, the Healys should expect to pay Adams Construction between $300 and $400 per square foot "all-in" to do the renovation work the Healys were planning.

8

24.     In response, the Healys advised Mr. Adams that the Healys would directly pay for all of the kitchen cabinetry, kitchen appliances, bathroom cabinetry, bathroom fixtures, all of the tile, lighting, light design, hardwood flooring, all of the marble for bathrooms and counter tops and the majority of the masonry costs and would therefore expect to pay at the low end of Mr. Adams' quoted $300 to $400 per square foot.  Mr. Adams agreed the cost per square foot would be reduced if the Healys were directly paying for these types of items.

25.     Mr. Adams also advised the Healys at the time that he was wrapping up his current renovation project in Sterling Valley and that he would be ready to begin work on the Healys' home no later than September or October 2012, if they were to purchase the home at 112 Thomas Pasture Road.  Additionally, Mr. Adams promised the Healys that the Defendants would only work on the Healys' renovation project until it was complete, and no others.  Relying on these various representations by the Adamses, the Healys made an offer on the home and ultimately purchased the home at 112 Thomas Pasture Road.

## MR. ADAMS' INABILITY TO PERFORM AND TO WORK WITH OTHERS

26.     Shortly after executing their purchase and sale agreement on 112 Thomas Pasture Road, the Healys hired Stowe, Vermont architect Paul Robert Rouselle ("Mr. Rouselle") and Mr. Adams, Mr. Rouselle and the Healys met collectively on several occasions to design the reconstruction of the property within the Healys' original budget.  After several months of meetings, which were paid for by the Healys, Mr. Adams and Mr. Rouselle were unable to work together given Mr. Adams' complete failure to engage and work with Mr. Rouselle on a construction plan and budget.  In fact, Mr. Rouselle was so disturbed by the unconscionable and deceptive practices of Mr. Adams, including the fact that Mr. Adams' projected construction costs were much higher than the Healys' original budget for the renovation project, that Mr.

9

Rouselle sent an email to Mr. Adams on December 3, 2012 demanding that Mr. Adams explain his deceptive actions. To the best of the Plaintiffs' knowledge, this email went unanswered.

27.     During this same time period, and without finalized written plans from an architect, Mr. Adams recommended to the Healys that he begin deconstruction of the existing home at 112 Thomas Pasture Road so that construction could begin as soon as possible. Mr. Adams also advised the Healys that final plans were not needed by the Defendants for the renovation project to begin. Based upon this recommendation of Mr. Adams, the Healys agreed to allow Mr. Adams to begin work tearing down parts of the structure of the home.

28.     During this same period in 2012, the Healys hired another Stowe, Vermont Architect, Mr. Jerry McDermott, who had been recommended to them by Mr. Adams and who had, according to Mr. Adams, worked with Mr. Adams before on another project. Because of the resulting delay caused by Mr. Adams' inability to work with Mr. Rouselle, the first architect hired by the Healys, the Healys' and Mr. Adams' agreed-upon original plan of drafting plans for the renovation before work began had to be abandoned if the Healys had any hope left of moving into a renovated home by December, 2013. Instead, the renovation project was converted by Mr. Adams to a "build-as-you-go" project where the Healys were forced to agree to Mr. Adams' piecemeal plan where Mr. Adams would build what had been agreed upon on a piece by piece basis, but before the builder's plans had been finalized.

29.     Additionally, at or about this same time, Mrs. Adams informed the Healys that she had created a timeline for the renovation project using an online time management tool that the Healys could monitor. Mrs. Adams also promised the Healys that she would to keep this tracking system up to date and current. Not long after making these promises, however, Mrs.

Adams, like her husband, broke her promise and failed to keep the tracking system up to date causing even greater frustration for the Healys.

30.     As the project unfolded, it became more and more clear to the Healys that Mr. Adams had a very difficult time working with anyone that the Healys had introduced to the renovation project.  In fact, Mr. Adams, more often than not, could not get along with anyone the Healys wanted to employ on the renovation project.  Here, even at this very early stage, many of Mr. Adams' promises of professionalism and skill in the general contracting field started to ring hollow to the Healys.  Two specific examples of this included both the mason, Matt Karlin, who had been picked by the Healys, and Dalia Tamari, from Dalia Kitchen Designs, a company also picked by the Healys.  From what the Healys observed, both of these subcontractors appeared to experience significant difficulties in working with Mr. Adams.

### THE DEFENDANTS' UTTER FAILURE TO PERFORM AS PROMISED

31.     From early 2012 to late 2013, Mr. Adams began to slowly renovate the Healys' home at 112 Thomas Pasture Road.  Although some progress did occur, Mr. Adams' pace of work regularly failed to meet Mr. Adams' various and numerous promised work completion dates.  For example, in or about the fall of 2013, when it became clear to the Healys that they would not be moved in by December of 2013 because their home was not even fully roofed, the Healys began to press Mr. Adams for a completion date to have the home fully roofed and sided as the winter months were rapidly approaching.

32.     In response, Mr. Adams repeatedly promised the Healys these items would be completed by November or December 2013 at the absolute latest.  The Healys relied upon these promises of Mr. Adams and provided Mr. Adams with additional funds to complete the work.

11

Like many of his hollow promises, Mr. Adams broke his promise and the Healys' home was not fully roofed and sided until the summer of 2014.

33.     Similarly, Mr. Adams repeatedly promised the Healys that everything necessary to fully install the kitchen and baths would be delivered to the Healys' home by the end of February, 2014 at the latest and that the kitchen and baths would be installed immediately. Instead, the kitchen was not installed in the home until June, 2014 and the bathrooms were not fully installed until August, 2014.

34.     When it became clear to the Healys that the house would not be completed by the original Christmas 2013 deadline, and following the Healys' repeated complaints, Mr. Adams committed to having the guest suite portion of the renovation project completed by the December, 2013 deadline so that the Healys' friends who were visiting would be able to stay in the guest suite. But Mr. Adams broke those promises as well and the guest suite was ultimately completed along with the rest of the house, in November, 2014. Further, none of the following elements of the house were completed by the deadline set forth by Mr. Adams and the Healys: the heating, the HVAC, the lighting, the proper electricity (400 amps versus the 200 amps) and the plaster.

35.     By April 2014, the Healys had reached their wit's end with Mr. and Mrs. Adams and their broken promises, over budget work and missed deadlines. Equally troubling, throughout the entire project, Mr. Adams never provided the Healys with a single written change order confirmation reflecting the agreed upon renovation changes even though the funds being consumed by the Defendants had skyrocketed well beyond the Healys' agreed-upon budget and what Mr. and Mrs. Adams had agreed to at the start of the renovation project.

36.     As a result of these repeated failures, the Healys considered halting the entire project for a few weeks in the spring of 2014 as they believed the Defendants' handling of the renovation project was completely out of control and over budget.  The Healys also wanted some time to consider their options of continuing to work with the Defendants or finding a new contractor to finish the renovation project.  When the Healys advised Mr. Adams of their intentions, Mr. Adams convinced the Healys to continue working with him on the project and he promised, again, to work on securing actual costs to finish the project.

37.     Ironically, in or about this same time period, Mrs. Adams went on vacation out of the country to England and Scotland for several weeks.  At this point, the Defendants had been provided with nearly $3,000,000 of the Healys' money, none of which had been accounted for to the Healys.  While Mrs. Adams was on vacation, the Defendants became even more over-extended as the Defendants apparently were not paying the subcontractors' bills during this time period.

38.     As a result, Adams Construction needed more funds from the Healys, yet again, that went well over the monthly allocated budget and required the Healys to pay even more money than had been budgeted just to keep the subcontractors current.  In turn, in or about April, 2014, the Healys and the Defendants met in person and the Defendants again agreed to account for all the funds provided to them, and further agreed to some additional strict reporting requirements to account for the additional funds the Healys would be providing to finish the renovation project.  After this meeting in or about April, 2014, after her return from her extended trip to England and Scotland, Mrs. Adams never met with the Healys again.

39.     More particularly, at that April, 2014 meeting, the Healys asked, and Mr. and Mrs. Adams agreed to provide, all invoices for all work performed, invoices for all supplies and

materials used, and payroll information and invoices for all fixed costs for the Adams

Construction laborers who were to perform the remainder of the work needed to complete the

house.  Like their numerous previous promises to provide this type of information, both Mr. and

Mrs. Adams, again, promised to provide this specific information to the Healys going forward

and further agreed to provide the first batch of information no later than the middle of May,

2014.  Mr. Adams specifically asked for ten (10) days to reach out to his subcontractors to get

final numbers to complete the renovation project and he would then provide the Healys with the

information.

      40.     In addition, in yet another attempt to manage the Defendants' use of cash, the

Healys also asked the Defendants for a list of the vendors and subcontractors who would accept

payment on credit cards in hopes of freeing up some of the cash flow issues.  In response to that

request, Mr. Adams falsely informed the Healys that only a handful of his vendors would accept

credit cards and to set up those accounts with a direct bill to the Healys would take a great deal

of work and was not worth it.  The Healys later learned that Mr. Adams' representations

concerning his vendors accepting credit cards were false.

      41.     By May of 2014, not much had changed.  Mr. Adams did provide a few updates,

but again failed to provide the detailed pricing and cost information to the Healys they had

requested and that he had promised in April to deliver to the Healys no later than mid-May.  As a

result, and once again, the Healys considered terminating the Defendants but reached the

conclusion that it would be easier, hopefully, to finish the renovation project with the Defendants

given the number of complications and nuances around the project, as opposed to firing the

Defendants and bringing someone else in to finish the job.  The Healys also expressly relied on

Mr. Adams' continuing promises to account for all the funds provided to him by the Healys.

14

42.     By mid-June of 2014, the Defendants had still not provided the Healys with the
pricing information or requested documentation regarding invoices to support the millions of
dollars in bank draws.  Notwithstanding his numerous promises to provide this information, Mr.
Adams, for the first time in nearly two years, advised the Healys that "contractors and vendors
do not work that way in Vermont and are not able to give final pricing."   Not long after making
these comments, Mr. Adams then, after repeated additional requests, provided the Healys with a
spreadsheet detailing projected costs for the upcoming month and actual costs from the previous
month.  See Exhibit A.

43.     Once receiving this spreadsheet, the Healys were again greatly discouraged, not
only with the lack of information provided by Mr. Adams, but by how far Mr. Adams had taken
this project out of budget.  In turn, in addition to the regular weekly meetings and/or bi-weekly
meetings, the Healys began holding monthly meetings with Mr. Adams to discuss and agree
upon projected costs for the upcoming months and to discuss actual costs from the previous
months.  These meetings between the Healys and Mr. Adams continued through July, August,
September and October of 2014.  Mr. Adams held these meetings without Mrs. Adams as she
refused to meet with the Healys after April, 2014.  There was no extensive discussion of her
absence, except that Mr. Adams commented that the Healys' and the Defendants' financial
conversations had, according to Mr. Adams, "crossed some sort of threshold and there would be
no coming back from it."  During this same time period, the Defendants continued to provide
some summary spreadsheets.  See Exhibit B.  The Defendants never provided the back-up
invoices or other supporting documents to substantiate or account for what the Healys had paid
to the Defendants, nor did the Defendants ever provide the Healys with a single invoice or other

document explaining what builder's fee the Defendants were paying themselves from the millions of dollars provided to them by the Healys.

44.     By October of 2014, however, the Healys had reached the breaking point with the Defendants.  More particularly, on or about October 19, 2014, Mr. Adams emailed the Healys advising that the cost for labor for five weeks in October and three weeks in November would be $80,000 and $45,000, respectively.  Mr. Adams also sent the Healys a list of task items that needed to be completed in order for their house to be finished.  As a result of this email, on or about October 27, 2014, the Healys transferred an additional $80,000.00 to Adams Construction's bank account at Union Bank, P.O. Box 667, Morrisville, Vermont, 05661 to account # 20231741 routing # 011601100.  At the time, the Defendants had approximately $30,000 in their bank account that had been provided to them previously by the Healys.  The additional $80,000 in funds were provided by the Healys to cover the labor costs for the remainder of October, 2014 and to leave Mr. Adams with working funds for November.

45.     Here again, the Healys reminded Mr. Adams, and Mr. Adams agreed, that no subcontractors were to be paid with this money and it was for Mr. Adams' hired labor only, as the Healys wanted all mechanics' liens and copies of all detailed invoices for their records, for insurance purposes, and so they could perform their final audit of the funds provided to Mr. Adams.  The Healys had been advised to request this by Mr. Bruce Stewart of Spartan Risk Management, the person they had hired to perform their final audit.

46.     On or about October 31, 2014, the Healys met with Mr. Adams at their home at 112 Thomas Pasture Road to conduct a detailed walkthrough of the renovation project and to develop a punch list of items to complete the project.  During this meeting, Mr. Adams

again asked the Healys for more money. By that time, the Healys had closed the joint bank account Mr. Adams had previously drawn the Healys' money from in order to fund the renovation project.

47.     In response to Mr. Adams' request for more money, Mr. Healy advised Mr. Adams that all final invoices would need to come to the Healys directly and that the Healys would need documentation of all invoices at that point to ensure that all mechanics' liens had been signed off on by the subcontractors and so they could determine if any final payment to Adams Construction was required or if Adams Construction had been overpaid and funds needed to be returned.

48.     It was at that point that Mr. Adams advised that he had paid all the subcontractors to date using the funds provided to him by the Healys and that Mr. Adams could not hold back any final payments because, according to Mr. Adams, "Vermont subcontractors do not work that way and expect prompt payment." In response, Mr. Healy advised Mr. Adams that he could have any of Mr. Adams' subcontractors call him directly if they had an issue with the process.

49.     In response, Mr. Adams became highly agitated and again demanded more money from Mr. Healy. Mr. Healy refused to provide Mr. Adams with the additional funds he demanded and Mr. Adams fled the worksite, but not before directing his workers to pack up their tools and leave, which they then did. Fearing for his family's safety, and for the security of the property during this altercation given Mr. Adams' highly erratic and highly agitated behavior, Mr. Healy contacted the Stowe, Vermont Police Department. Officers from that police department stood by while Mr. Adams and his workers removed their tools and belongings.

50.     Not long after Mr. Adams abandoned the renovation project, the Healys realized for the first time that Mr. Adams, in addition to removing his tools and personal property, had

17

also apparently removed the master drawings and plans for the house that were both paid for and owned by the Healys as they were last seen on Mr. Adams' workbench shortly before Mr. Adams entered the property to remove his personal property. Additionally, the Defendants have never returned to the Healys all of the appliance and fixture manuals the Healys paid for with the purchase of those items, nor have the Defendants ever returned the lighting and CAT wiring drawings that were paid for by the Healys and used by the Defendants during the renovation.

51.     In addition, the Healys also soon learned that the Defendants had failed to finalize and/or repair numerous punch list items that the Healys had paid for, including, but not limited to:  missing light fixtures that had been shipped to the Defendants' personal home but never brought to the job site; damage to a freezer door by Adams Construction; failure to properly build an exterior staircase that resulted in the staircase having to be torn down; failure to cut and install a dryer vent; failure to run and install 400 amp service to the home; and failure to obtain the Healys' authorization before laying the driveway and removing certain protected trees.

52.     As detailed in this Complaint above, as part of the agreement between the Healys and the Defendants, the Healys established a joint checking account with Mr. Adams that Mr. Healy would fund and that Mr. Adams could draw upon to make payments to the subcontractors he had hired and to pay the Defendants the agreed upon cost-plus builder's fee once the Defendants had accounted for their expenditures. The parties expressly agreed the joint checking account would be used only for that purpose and with those express conditions. In addition to the $80,000 in funds provided to Mr. Adams on October 27, 2014 by Mr. Healy, and the initial payment of $50,000 to Mr. Adams as a consulting fee in the fall of 2012, between November, 2012 and October, 2014, Mr. Adams withdrew the following funds (See Exhibit C) from the

18

joint checking account and deposited those funds directly into his own bank account at Union

Bank:

| Date Deposited | Amount | Deposit Type |
|----------------|--------|--------------|
|                |        |              |

| | | |
|---|---|---|
| 11/9/12 | $50,000 | by check |
| 12/11/12 | $50,000 | by check |
| 1/7/13 | $50,000 | by check |
| 1/23/13 | $50,000 | by check |
| 2/21/13 | $100,000 | by check |
| 3/4/13 | $50,000 | by check |
| 3/7/13 | $50,000 | by check |
| 3/27/13 | $50,000 | by check |
| 4/10/13 | $50,000 | by check |
| 4/15/15 | $50,000 | by check |
| 4/29/13 | $50,000 | by check |
| 5/14/13 | $50,000 | by check |
| 5/24/13 | $50,000 | by check |
| 5/31/13 | $100,000 | by check |
| 6/10/13 | $50,000 | by check |
| 6/17/13 | $100,000 | by check |
| 7/12/13 | $150,000 | by check |
| 8/7/13 | $150,000 | by check |
| 8/23/13 | $50,000 | by check |
| 9/18/13 | $100,000 | by check |
| 9/27/13 | $5,000 | by electronic payment |
| 10/2/13 | $150,000 | by check |
| 10/15/13 | $150,000 | by check |
| 11/4/13 | $150,000 | by check |
| 11/25/13 | $50,000 | by check |
| 12/3/13 | $150,000 | by check |
| 12/23/13 | $50,000 | by check |
| 1/7/14 | $150,000 | by check |
| 1/21/14 | $100,000 | by check |
| 2/3/14 | $200,000 | by check |
| 2/14/14 | $120,000 | by check |
| 2/24/14 | $43,000 | by electronic payment |
| 3/10/14 | $150,000 | by check |
| 3/28/14 | $10,000 | by check |
| 3/28/14 | $150,000 | by check |
| 4/16/14 | $45,000 | by check |
| 4/25/14 | $150,000 | by check |
| 4/25/14 | $2,537.13 | by check |
| 5/23/14 | $100,000 | by check |
| 6/2/14 | $75,000 | by check |
| 6/12/14 | $175,000 | by check |
| 7/8/14 | $175,000 | by check |
| 7/29/14 | $125,000 | by check |
| 8/21/14 | $50,000 | by check |
| 8/26/14 | $100,000 | by check |

Downs
Rachlin
Martin PLLC

| 9/10/13 | $75,000 | by check |
|---|---|---|
| 9/30/14 | $120,000 | by check |
| 10/6/14 | $50,000 | by check |
| **TOTAL** | **$4,270,537.13** | |

53.     The total of all the monies paid to the Defendants by the Healys was $4,400,537.

Again, the original agreed upon budget, prepared by Mr. Adams for the entire renovation project

was $1,500,000 to $2,000,000, based upon the Defendants' numerous promises that the

Defendants could build a high quality home for between $300 and $400 per square foot "all-in."

That number, according to Mr. Adams, was to include everything to build a high quality home,

including, but not limited to: kitchen cabinetry, kitchen appliances, bathroom cabinetry,

bathroom fixtures, all of the tile, lighting, light design, hardwood flooring, all of the marble for

bathrooms and counter tops and the masonry costs.  In the end, however, the Healys ending up

paying for most of these items themselves directly even though the construction cost per square

foot charged by Mr. Adams had grossly exceeded his estimates and failed to account for Mr.

Adams agreed upon reduction if the Healys had paid for many of these items themselves.

54.     On or about December 8, 2014, Mr. Healy sent an email, as well as a certified

letter to Mr. Adams (attached at Exhibit D), which stated the following:

Dear Billy,

As you are well aware, prior to October 31, 2014  Adams Construction was the
active manager of my project at 112 Thomas Pasture in Stowe VT.  Both before
and after that date, I have made numerous requests for documentation to support
the many bank pulls you have made throughout the project.  Notwithstanding
those requests, we still have not received from Adams Constructions any invoices
for Subcontractors, Suppliers nor you as the Builder (hourly rate)  and General
Contractor (Subcontractors cost marked up by 10%).  We also still have not had
returned all manuals, pictures, lighting and CAT drawings that you that you
removed from the construction site.

The last high level report you provided showed balance in our favor of $ 30,813.2
as of 10/10/2014. We wired to you per your request on 10/27/2014 an additional

$80,000. In light that you did not remain on the project we would like a full accounting of this money and an immediate refund of any balance.

We once again ask for a detailed explanation and invoice documentation on all costs associated with the building project and the reconciliation of all funds provided to you.

We would ask that this be sent to my office no later than December 18th 2014.

R.T. Consulting
c/o Philip Healy
RT Consulting
4 Main Street
Peterborough NH 03458

Thank you for your prompt attention to this matter.

Sincerely,


Philip B. Healy

55.     Mr. Adams never answered Mr. Healy's email.  On December 19, 2014, Mr. Adams signed for the certified letter sent to him by Mr. Healy (see signed receipt attached at Exhibit E) but he also never responded to that specific request.

56.     In or about mid-December 2014, and in a further attempt to determine exactly how much money the Defendants unlawfully took from the Healys, the Healys, through their counsel, contacted a large number of the subcontractors that worked on the renovation project. The Healys also conducted their own investigation by contacting one of the subcontractors, Peak Electric.  As of the filing date of this Complaint, the Healys and their counsel could only confirm the following invoice amounts billed to the Defendants:

| Subcontractor | Total Invoices |
| --- | --- |
| Baker Plumbing & Heating | $201,482.10 |
| Burlington Glass Center | $11,000.00 |
| Casella | $22,962.49 |
| Clear Water Filtration | $8,382.93 |
| Dale Percy | $11,211.39 |

| DeWolfe Engineering | $16,920.98 |
| Green Mountain Landscaping, Inc. | $750.00 |
| Grenier Engineering | $6,354.75 |
| Peak Electric | $170,403.01 |
| Pella | $131,723.78 |
| RCWA | $6,705.00 |
| Simpson Cabinetry | $2,063.87 |
| Sterling Staircase & Handrail Co. | $53,038.77 |
| **TOTAL** | **$642,999.07** |

As of the filing date of this Complaint, it is unclear if all of these invoices were actually paid by the Defendants.

57.     As a result of this investigation and the various responses from the subcontractors, more than $3.6 million dollars in funds provided to the Defendants remains totally unaccounted for by the Defendants in connection with the renovation project.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (Against all Defendants)

58.     Plaintiffs restate and re-allege the allegations contained in Paragraphs 1 through 57 of their Complaint as if fully set forth herein.

59.     As outlined in the facts above, Mr. Adams and Mrs. Adams, both individually, and on behalf of Adams Construction VT, LLC entered into a contract with the Plaintiffs in late 2012 to perform a multi-million dollar renovation of their existing home at 112 Thomas Pasture Road.  The worked to be performed by the Defendants included remodeling certain portions of the existing home, knocking down other sections of the home and then building from the ground-up new sections of the home.  The initial cost and budget for the renovation project was estimated and represented by the Defendants to be $1,500,000.00 to $2,000,000.00.  As the renovation project progressed, both the Defendants and the Healys agreed that there would be an

increase to that budget but Mr. Adams assured and promised the Healys that he could provide the renovations with top of the line finishes for between $300 and $400 per square foot "all-in."   By the end of the renovation project, the total cost to the Plaintiffs exceeded $4,350,000 for the renovation which did not include the Healys paying for many of the items that were to be covered by the Defendants' per square foot price.

60.     Before the Defendants began work on the renovation project, Mr. Adams agreed in several conversations with Philip Healy and/or with Lee-Ann Healy to charge the Healys on a cost-plus basis for the Defendants' general contracting services.  The cost-plus basis builder's fee agreed upon by the Healys and Mr. Adams required the Healys to pay the Defendants a fee of 10% of all sums paid to the subcontractors that had been hired by the Defendants in connection with the Healys renovation project.  The Defendants agreed to charge this fee as part of their promised regular billings and accountings to the Healys.

61.     The cost-plus basis builder's fee agreed upon by the parties did, however, have several agreed-upon exclusions.  All supplies purchased by the Defendants were to be charged only at the Defendants cost and Adams Construction would not receive any builder's fee as a result of those payments and/or charges.  Further, the Defendants would also not be paid a fee for any subcontractor hired by the Healys directly or for any building supplies or products purchased by the Healys directly.

62.     As part of their agreement, Mr. Adams and Mrs. Adams also expressly agreed to account for all the monies paid to the Defendants by the Healys and to account for all monies paid to the subcontractors by Mr. Adams, Mrs. Adams and/or Adams Construction.  The Healys required that Mr. Adams, Mrs. Adams and Adams Construction account for their funds so that the Defendants cost-plus builder's fee could be properly calculated and so the Healys could

Downs
Rachlin
Martin PLLC

24

properly monitor where their money was going and what it was being used for by the
Defendants.

63.     The Healys relied on these various representations and promises by the
Defendants before hiring Mr. Adams, his wife and their company, Adams Construction, and
further relied on those representations throughout the renovation project when the Healys
provided funds to the Defendants so that Mr. Adams, Mrs. Adams and/or Adams Construction
could pay the subcontractors as the parties had agreed. At the time the Defendants were hired,
they agreed to perform the renovation project is less than a year and to have the Healys' home
move-in ready by Christmas of 2013.

64.     Between December 2012 and October, 2014, the Healys provided the Defendants
with $4,350,537 as a result of Mr. Adams repeated requests for funds to pay himself, Adams
Construction and the subcontractors he allegedly hired to work on the renovation project.
Despite the Healys repeated and numerous oral and written requests to both Mr. Adams and
Mrs. Adams throughout the renovation project for the Defendants to account for the funds
provided to the Defendants, and both Mr. Adams and Mrs. Adams repeated promises to the
Healys to account for those funds, both Mr. Adams and Mrs. Adams repeatedly failed to account
for those funds and/or ignored the Plaintiffs' numerous requests in direct breach of the contract
reached by the Healys and the Defendants.

65.     In addition, at the time of the filing of this Complaint, the Healys had also paid
the Defendants approximately $110,000 for several weeks of labor that was never performed by
the Defendants or their workmen, which despite several written requests as well, Mr. Adams and
Mrs. Adams have refused to return. To date, the Defendants have also refused to account for any
of the $4,350,537 provided to them by the Healys. Finally, the Healys had to spend more than

$80,000 on their own contractors to finish the work the Defendants never completed, including, but not limited to, HVAC work, plumbing, finishing staircases, and some of the finish carpentry.

66.     Therefore, by failing to complete and perform the renovation project for the promised $300-$400 per square foot, which was to be reduced by the materials and supplies directly purchased by the Healys; by repeatedly failing to meet the promised work completion deadlines; by repeatedly failing to account for the monies provided to them by the Plaintiffs; by failing to return the overpayments for labor, and by requiring the Healys to spend more than $80,000 on their own contractors to finish work the Defendants agreed to complete, the Defendants breached their contract with the Healys.  On information and belief, the Defendants also grossly overpaid themselves in connection with the agreed upon builder's fee, in direct breach of the parties contract, in an amount to be determined at trial.  As a direct and proximate result of those breaches of contract, the Healys have suffered both direct and consequential damages in excess of $190,000.

**COUNT II**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against all Defendants)**

67.     Plaintiffs restate and re-allege the allegations contained in Paragraphs 1 through 66 of their Complaint as if fully set forth herein.

68.     A covenant of good faith and fair dealing is implied into every contract in the State of Vermont.

69.     The covenant encompasses a variety of types of conduct characterized as involving bad faith because they violate community standards of decency, fairness or reasonableness.  Additionally, the underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the

benefits of the agreement.  Parties must act with faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party.

70.     The Contract entered into between the Healys and the Defendants for the Defendants to renovate the Healys' home is a valid contract between the Healys and the Defendants and thus a covenant of good faith and fair dealing is implied in that contract.

71.     Separate and apart from their breaches of the contract, and based on the conduct of the Defendants detailed above, the Defendants also acted arbitrarily, unreasonably, in bad faith, and not in accordance with their expected contractual performance and prevented the Healys from reaping the benefits of the  contract.  As a result, the Healys suffered substantial damages in excess of $190,000.

**COUNT III**
**NEGLIGENT MISREPRESENTATION**
**(Against Mr. and Mrs. Adams)**

72.     Plaintiffs restate and re-allege the allegations contained in Paragraphs 1 through 71 of their Complaint as if fully set forth herein.

73.     Under Vermont law, an individual can be held liable for negligent misrepresentation when, in the course of his or her business, profession or employment, or in any other transaction in which he or she has a pecuniary interest, he or she supplies false information for the guidance of others in their business transactions, which is justifiably relied upon by the party receiving the information, if the party providing the information fails to exercise reasonable care or competence in obtaining or communicating the information.

74.     Reliance upon a representation is justifiable when the representation is not obviously false and the truth of the representation is not within the knowledge of, or known by the plaintiffs.

Downs
Rachlin
Martin PLLC

27

75.     Therefore, because Mr. and Mrs. Healy both made numerous negligent misrepresentations to the Healys, as outlined in the facts above, both are liable to the Healys for the damages resulting from those negligent misrepresentations.

76.     More particularly, and as described more fully above, the Defendants first made negligent misrepresentations to the Healys when Mr. Adams falsely and fraudulently advised the Healys that a written contract should not be executed to cover the renovation project, and that such a contract was not required, because builder's contracts were not used in Vermont.  The Defendants made further negligent misrepresentations to the Healys when they made numerous knowingly negligent, false and/or bogus representations to the Healys regarding the Defendants' ability to perform the renovation project within the budget, timeline and as quoted and promised to the Healys.

77.     Additionally, once the Defendants entered into their contract with the Healys, the Defendants made numerous other negligent representations to the Healys when they repeatedly and negligently promised the Healys that they could finish the project according to the above described and agreed upon timeframes and pricing in order to dupe the Healys into making additional payments to the Defendants over the originally quoted price and by repeatedly making the negligent misrepresentation to the Healys that the Defendants would account for all monies provided to the Defendants by the Healys.

78.     The Defendants also made negligent representations to the Healys by taking an additional $80,000 advance from the Healys for labor costs towards the end of the renovation project after negligently and/or falsely promising the Healys that those funds would be used expressly for that purpose, and that purpose alone.  The Defendants then failed to perform the

promised labor and then refused to return those and other unused funds totaling more than $110,000 when requested.

79.     The Defendants also made negligent representations to the Healys when they negligently and/or falsely informed the Healys that only a handful of the vendors working on the renovation project for the Defendants would accept credit cards and to set up those accounts with a direct bill to the Healys would take a great deal of work.

80.     The Defendants also made negligent misrepresentations to the Healys by negligently and/or falsely promising to finalize and/or repair and/or return numerous punch list items, including, but not limited to:  negligently promising to return missing light fixtures that had been shipped to Mr. Adams' personal home but not brought to the job site; negligently promising to fix damage to a freezer door done by Adams Construction; negligently promising to fix an improperly built exterior staircase that resulted in the staircase having to be torn down; falsely promising to cut and install a dryer vent; negligently promising to run and install 400 amp service to the home; and negligently promising to obtain the Healys' authorization before laying the driveway and removing certain protected trees.

81.     The Defendants also made negligent misrepresentations in connection with the agreed upon builder's fee and by negligently promising to account for what they were paying themselves and then never providing a single invoice or other document explaining what builder's fee they were paying themselves from the millions of dollars provided to them by the Healys.

82.     As a direct and proximate result of these negligent misrepresentations, the Healys have suffered damages in an amount exceeding $190,000.

Downs
Rachlin
Martin PLLC                                    29

**COUNT IV**
**UNFAIR AND DECEPTIVE BUSINESS PRACTICES UNDER VERMONT**
**CONSUMER FRAUD ACT - 9 V.S.A. § 2453**
**(Against all Defendants)**

83.     Plaintiffs restate and re-allege the allegations contained in Paragraphs 1 through 82 of their Complaint as if fully set forth herein.

84.     According to the Vermont Consumer Fraud Act, 9 V.S.A. § 2453, a party violates the Vermont Consumer Fraud Act if he or she engages in an unfair or deceptive act or practice in commerce.

85.     An act occurs in commerce if it takes place in the context of an ongoing business in which the defendant holds himself out to the public.

86.     An act is unfair or deceptive where there is (1) a representation, practice, or omission by the defendant that was likely to mislead consumers; (2) the plaintiff interpreted the message reasonably under the circumstances; and (3) the misleading effects were material, meaning that the conduct influenced plaintiff's conduct regarding the transaction.

87.     Therefore, because the Defendants engaged in unfair and deceptive acts and practices as outlined in the facts above, all of the Defendants are liable to the Healys for damages resulting from those unfair and deceptive acts and practices.

88.     More particularly, and as described more fully above, the Defendants first violated the Vermont Consumer Fraud Act when Mr. Adams falsely and fraudulently advised the Healys that a written contract should not be executed to cover the renovation project, and that such a contract was not required, because builder's did not need to be licensed in Vermont and that builders contracts were not used in Vermont. The Defendants further engaged in a fraudulent and deceitful course of conduct meant to dupe the Healys into entering into the contract to renovate their home by making false and bogus representations to the Healys

Downs
Rachlin
Martin PLLC

30

regarding the Defendants ability to perform the renovation project within the budget, timeline and as quoted and promised to the Healys.

89.     Additionally, once the Defendants entered into their contract with the Healys, the Defendants violated the Vermont Consumer Fraud Act by repeatedly and falsely promising the Healys that they could finish the project according to the above described and agreed upon timeframes and pricing in order to dupe the Healys into making additional payments to the Defendants over the originally quoted price and by repeatedly making the false promise to the Healys that the Defendants would account for all monies provided to the Defendants by the Healys.

90.     The Defendants also violated the Vermont Consumer Fraud Act by taking an additional $80,000 advance from the Healys for labor costs towards the end of the renovation project after falsely promising the Healys that those funds would be used expressly for that purpose, and that purpose alone. The Defendants then failed to perform the promised labor and then refused to return those and other unused funds totaling more than $110,000 when requested.

91.     The Defendants also violated the Vermont Consumer Fraud Act by falsely informing the Healys that only a handful of the vendors working on the renovation project for the Defendants would accept credit cards and to set up those accounts with a direct bill to the Healys would take a great deal of work.

92.     The Defendants also violated the Vermont Consumer Fraud Act by taking and refusing to return numerous items paid for and owned by the Healys, including, but not limited to:  the renovation blueprints, all of the appliance and fixture manuals the Healys paid for with the purchase of those items, the lighting and CAT wiring drawings that were paid for by the Healys and used by the Defendants during the renovation.

Downs
Rachlin
Martin PLLC

31

93.     The Defendants also violated the Consumer Fraud Act by failing to finalize and/or repair and/or return numerous punch list items that Mr. Adams had falsely promised to complete and/or return, including, but not limited to:  missing light fixtures that had been shipped to Mr. Adams' personal home but not brought to the job site; damage to a freezer door by Adams Construction; failure to properly build an exterior staircase that resulted in the staircase having to be torn down; failure to cut and install a dryer vent; failure to run and install 400 amp service to the home; and failure to obtain the Healys' authorization before laying the driveway and removing certain protected trees.

94.     On information and belief, the Defendants also violated the Consumer Fraud Act by grossly overpaying themselves in connection with the agreed upon builder's fee and by paying themselves throughout the project without ever providing a single invoice or other document explaining what builder's fee they were paying themselves from the millions of dollars provided to them by the Healys.

95.     As a direct and proximate result of these knowing, willful and intentional violations of the Vermont Consumer Fraud Act by the Defendants, the Healys have suffered damages in an amount exceeding $190,000.  Further, because the Defendants' actions were knowing, willful and intentional, the Court should increase the amount up to treble the amount found by the fact-finder and this Court should also order that the Defendants pay all the Healys' attorneys' fees and costs required to bring this action.

## COUNT V
## QUANTUM MERUIT/UNJUST ENRICHMENT
### (Against all Defendants)

96.     Plaintiffs restate and re-allege the allegations contained in Paragraphs 1 through 95 of their Complaint as if fully set forth herein.

97.     By their actions and/or inactions set forth above, the Defendants knowingly,

willfully and intentionally unjustly enriched themselves through their retention of at least

$110,000 based upon the Defendants' unlawful retention of the funds provided to them by the

Healys for labor that was never started or completed on the renovation project.

98.     By their actions and/or inactions set forth above, the Defendants knowingly,

willfully and intentionally unjustly enriched themselves in an amount that, on information and

belief, could easily exceed $1,000,000 based upon the Defendants' complete and utter refusal to

account for all the funds provided to them by the Healys.  As detailed above, more than $3.8

million provided to the Defendants by the Healys in connection with the renovation project

remains unaccounted for by the Defendants.

99.     As a result, it would be inequitable for the Defendants to enrich themselves

unjustly at the expense of the Healys.  In turn, the Healys have suffered damages in excess of

$110,000 in connection with the Defendants' unjust enrichment.

## COUNT VI
## CONVERSION
### (Against all Defendants)

100.    Plaintiffs restate and re-allege the allegations contained in Paragraphs 1 through

99 of their Complaint as if fully set forth herein.

101.    By their actions set forth above, the Defendants committed conversion through

their intentional and wrongful exercise of ownership, control and dominion over the Healys'

property after the Healys made lawful demand for the return of their property and the Defendants

refused to return that property.  These acts of conversion include, but are not limited to, the

Defendants' apparent theft of approximately $110,000 that was provided to them by the Healys

for labor never completed by the Defendants; the Defendants' potential conversion of up to $3.8

million of accounted for funds provided to the Defendants by the Healys; the Defendants'
unlawful retention of the renovation blueprints, all of the appliance and fixture manuals the
Healys paid for with the purchase of those items, the lighting and CAT wiring drawings that
were paid for by the Healys and used by the Defendants during the renovation, and the light
fixtures that were shipped to the Defendants' personal home but not given to the Healys.

102.    As a direct and proximate result of these acts of conversion by the Defendants, the
Healys have suffered damages in excess of $110,000.

**COUNT VII**
**FOR AN ACCOUNTING**
**(Against all Defendants)**

103.    Plaintiffs restate and re-allege the allegations contained in Paragraphs 1 through
102 of their Complaint as if fully set forth herein.

104.    By their actions set forth above, the Defendants induced the Healys to enter into
their contract with the Defendants by repeatedly agreeing to account for all the funds provided to
them by the Healys.  In particular, the Defendants repeatedly promised to account for and
provide all back-up documentation related to all suppliers, vendors, subcontractors and labor
hired, utilized and/or purchased by the Defendants in connection with the renovation project.
The Defendants also agreed to produce this information to the Healys to justify and substantiate,
in-full, how much the Defendants would get paid in connection with the agreed upon cost-plus
basis builder's fee.  In addition, notwithstanding several written requests by the Healys to the
Defendants, the Defendants have refused to account for the funds provided to them by the
Healys.

105.    As a result, the Healys hereby demand that the Defendants account for all the
funds provided to them by the Healys by providing the Healys with:  copies of all invoices,

purchase orders and detailed billing information provided to the Defendants by their suppliers, vendors, laborers and/or the subcontractors hired by the Defendants; by providing copies of all cancelled checks, credit card receipts, wires and/or money transfer transaction reports or other bank transaction documentation that relate in any way to payments made in connection with the renovation project and the $4,350,537 provided to them by the Healys; and by providing a detailed analysis and explanation of the cost-plus builder's fee retained by the Defendants out of the $4,350,537 provided to them by the Healys.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor of all accounts and award the Plaintiffs the following additional relief:

(a) Award the Plaintiffs compensatory and consequential damages, as well as any special damages, resulting from the Defendants' wrongdoing;

(b) Award the Plaintiffs treble damages pursuant to the Vermont Consumer Fraud Act;

(c) Award the Plaintiffs their attorneys' fees and costs which the Plaintiffs incurred in bringing this action;

(d) Award the Plaintiffs prejudgment interest;

(e) Order the Defendants to fully account for all the funds provided to them by Plaintiffs as prayed for in Count VII of the Complaint; and

(f) Award the Plaintiffs such other relief as this Court deems equitable and just.

## JURY DEMAND

Plaintiffs demand a trial by Jury on all issues so triable.

Downs
Rachlin
Martin PLLC

Dated at Burlington, Vermont this 13ᵗʰ day of April, 2015.

DOWNS RACHLIN MARTIN PLLC


By: _____
Christopher D. Roy
Attorneys for Plaintiffs
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190
Tel.: (802) 863-2375
Email: croy@drm.com

and

CASNER & EDWARDS, LLP


By: _____
George W. Price
*(pending Pro Hac Vice)*
Julie R. Bryan
*(pending Pro Hac Vice)*
303 Congress Street
Boston, MA 02210
Tel.: (617) 426-5900
Email: price@casneredwards.com
         bryan@casneredwards.com

## VERIFICATIONS

I, Philip Healy, on behalf of myself as the Co-Plaintiff in this lawsuit certify that I have read the Verified Complaint and the allegations contained herein are true, and, with respect to the allegations made on information and belief, that such allegations are true to the best of my knowledge and belief.

Signed under the pains and penalties of perjury, this 7 day of April, 2015.

_____
Philip Healy

I, Lee-Ann Healy, on behalf of myself as the Co-Plaintiff in this lawsuit certify that I have read the Verified Complaint and the allegations contained herein are true, and, with respect to the allegations made on information and belief, that such allegations are true to the best of my knowledge and belief.

Signed under the pains and penalties of perjury, this 7th day of April, 2015.

Lee-Ann Healy

15864966.1

KAYLEA M. VERVILLE
Notary Public, State of New Hampshire
My Commission Expires July 13, 2016

4/7/15